**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARY TYES-WILLIAMS,

        *Plaintiff*,

    v.

MERRICK GARLAND,[1]

        *Defendant*.

Civil Action No. 17-1191 (TJK)

<u>**MEMORANDUM OPINION**</u>

    Plaintiff, an African-American woman employed by the Bureau of Prisons' chaplaincy services, sues her employer. She asserts that in selecting another applicant for a promotion, the Bureau discriminated against her based on her race and sex in violation of Title VII. Defendant moves for summary judgment on the sole remaining discrimination claim in the complaint. For the reasons below, the Court will grant the motion and grant summary judgment for Defendant.

**I.**    **Background**

    Mary Tyes-Williams is an African-American woman. ECF No. 24-2 ¶ 1. She joined the Bureau of Prisons in September 2005 as a staff chaplain and has since worked there in various chaplain roles. *Id.* ¶ 2. In June 2014, the Bureau promoted Williams to serve as a GS-13 Chaplaincy Services Coordinator covering the Bureau's South Central and Southeast Regions. *Id.* ¶ 3. Chaplaincy Service Coordinators are responsible for the administration, support, and monitoring of institutional-level religious services and accommodations within their regions. *Id.* ¶ 6. These coordinators report to the Assistant Chaplaincy Administrator in the Chaplaincy

---

[1] Under Federal Rule of Civil Procedure 25(d), Attorney General Merrick Garland is automatically substituted as the defendant.

Services Branch of the Reentry Services Division at the Bureau's D.C. office.  *Id.* ¶ 8.  Assistant Chaplaincy Administrators report to the Chaplaincy Administrator, who reports to the Senior Deputy Assistant Director of Reentry Services, who reports to the Assistant Director of Reentry Services, who reports to the Director of the Bureau.  *Id.* ¶¶ 8, 10, 12, 14, 16.  During the time relevant here, Heidi Kugler served as the Chaplaincy Administrator.  *Id.* ¶ 11.  Patti Butterfield served as the Senior Deputy Assistant Director of Reentry Services.  *Id.* ¶ 13.  And Marion Feather served as the Assistant Director of Reentry Services.  *Id.* ¶ 15.

In December 2015, the Bureau posted a vacancy announcement to all chaplains inviting them to apply for the Assistant Chaplaincy Administrator position, which was vacant because of Kugler's promotion to Chaplaincy Administrator.  *Id.* ¶¶ 9, 11, 17.  Ten chaplains applied for the position, including Williams and Kevin Kelley, another coordinator.  *Id.* ¶ 19.  Feather was the selecting official for the position, which meant she made the final decision on who to hire. *Id.* ¶ 20.

Kugler was the recommending official.  *Id.* ¶ 21.  Her responsibilities included reviewing applications and making a recommendation to Feather.  *Id.*  Kugler also completed reference checks for the three applicants whom she had supervised, including Williams and Kelley.  *Id.* ¶ 22.  Kugler gave Williams the highest available rating in six out of the six skill categories on the reference form.  *Id.* ¶ 23.  She also gave Williams the highest rating for leadership skills and noted that she would employ Williams in the position.  *Id.*  Kugler gave the same ratings to Kelley and noted she would employ him in the position as well.  *Id.* ¶ 24.

Kugler prepared a summary chart listing each applicant and their position, prior positions, education, and relevant training.  *Id.* ¶ 33.  The chart included a comments section in which Kugler included a synthesis of each applicant's written submission.  *Id.* ¶ 34.  The chart also

reflected Kugler's recommendations for the position. *Id.* ¶ 35.  Kugler recommended Kelley first, Michael Castle second, Elmer Torrens third, and Williams fourth. *Id.* ¶ 36.

Kugler attached sticky notes to the chart that contained additional thoughts on each candidate. *Id.* ¶ 38.  As for Williams, Kugler wrote that she was "the newest Chaplaincy Services Coordinator" and that she "need[ed] some further professional development before assuming this kind of role, particularly in stress management and emotional intelligence." *Id.* ¶ 40.  As to Kelley, Kugler wrote that he had the "most administrative seniority and experience" and that he "possess[ed] the needed people [skills], technical ability, and follow through for the branch. *Id.* ¶ 39.  Kugler also wrote that he "has a good repoire [*sic*] with field, regional, and central office staff." *Id.*

Because Kugler had been the first-line supervisor and was later the second-line supervisor for both Williams and Kelley, Butterfield completed reference material for each candidate as their third-line supervisor. *Id.* ¶¶ 25–26.  She gave Williams the highest rating in five out of the six categories, an average rating in the "oral communication skills" category, the highest rating in leadership skills, and noted she would employ Williams in the position. *Id.* ¶ 28.  Butterfield gave Kelley the highest rating in all six categories and in leadership skills and also noted she would employ him in the position. *Id.* ¶ 27.  Kugler and Butterfield sent their references to Feather. *Id.* ¶ 32.

Kugler, Butterfield, and Feather conferred about the candidates. *Id.* ¶ 42.  During this discussion, Feather asked Kugler why she had rated Torrens above Williams. *Id.* ¶ 43.  Kugler answered that she wanted to give non-central office chaplains the opportunity for consideration. *Id.*  Butterfield agreed with Kugler that Kelley should be selected. *Id.* ¶ 53.  Ultimately, Feather selected Kelley for the position in February 2016. *Id.* ¶ 44.

## II.    Procedural History

Williams sued in June 2017, alleging a slew of claims under Title VII.  Defendant moved to dismiss several of those claims for failure to exhaust her administrative remedies and for failure to state a claim.  The Court granted that motion in January 2019 and dismissed all of Williams's claims except for Count I, which alleges race and sex discrimination in violation of Title VII.  After discovery closed, Defendant moved for summary judgment on Williams's remaining claim.

## III.   Legal Standard

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor." *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).  To survive summary judgment, a plaintiff must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation omitted).  Courts "are not to make credibility determinations or weigh the evidence."  *Lopez*, 826 F.3d at 496 (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).  But the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).  If the evidence "is merely colorable, or is not significantly

probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

"The movant bears the initial burden of demonstrating that there is no genuine issue of material fact." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). "In response, the nonmovant must identify specific facts in the record to demonstrate the existence of a genuine issue." *Id.* And for claims where the non-movant bears the burden of proof at trial, as here, she must make an evidentiary showing "sufficient to establish the existence of [each] essential element to [her] case." *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and therefore entitles the moving party to "judgment as a matter of law." *Id.* at 323. "Importantly, while summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 17 (D.D.C. 2009) (cleaned up).

## IV.  Analysis

"Title VII permits a plaintiff to establish liability in either of two ways.  He may bring a case pursuant to 42 U.S.C. § 2000e-2(a)(1) on what we have called a 'single motive' or 'pretext' theory of discrimination, which requires him to prove the employer's improper consideration of a protected characteristic was a but-for cause of an adverse employment decision.  Alternatively, a plaintiff may advance a 'mixed-motive' theory of liability pursuant to 42 U.S.C. § 2000e-2(m), which allows a plaintiff unable to establish but-for causation to prevail as long as he can show that unlawful discrimination was 'a motivating factor' for the decision." *Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019) (cleaned up). "Under the latter approach, the plaintiff's recovery is limited to declaratory relief, certain fees and costs, and an injunction not including

'admission, reinstatement, hiring, or promotion.' § 2000e-5(g)(2)(B).  Even though we have

described but-for and mixed-motive cases as alternative ways of establishing liability, a plaintiff

may proceed under both theories simultaneously."  *Id.* (cleaned up).

"Under either theory, if the record does not contain direct evidence that the adverse

employment action was caused by prohibited discrimination," a court "turn[s] to the burden

shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973), which

requires the plaintiff first to establish a prima facie case of discrimination; then, the employer can

show its decision was taken for a 'legitimate nondiscriminatory reason."  *Id.*  That framework

first requires Williams to show that: "(1) she is a member of a protected class; (2) she applied for

and was qualified for an available position; (3) despite her qualifications she was rejected; and

(4) someone filled the position."  *Baylor v. Powell*, 459 F. Supp. 3d 47, 54 (D.D.C. 2020)

(citation omitted).  Defendant does not dispute that Williams satisfies this minimal burden—she

is African-American and female, she applied and was qualified for the assistant chaplaincy

position, and the Bureau rejected her and chose Kelley.  In response, Defendant must "assert[ ] a

legitimate, non-discriminatory reason for the decision" not to hire Williams.  *Brady v. Office of

Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  And Defendant has met that burden by

asserting that Kelley was chosen because he was more qualified than Williams.  ECF 24-2 ¶ 57.

The Court must therefore "resolve one central question," considering "all relevant

evidence presented by" Williams and Defendant:  Has Williams "produced sufficient evidence

for a reasonable jury to find that [Defendant's] asserted non-discriminatory reason was not the

actual reason and that [he] intentionally discriminated against [her] on the basis of race"?  *Brady*,

520 F.3d at 494.

In non-selection cases such as this one, an employee may avoid summary judgment by showing her employer's proffered reason was pretextual if she was "significantly better qualified for the job than the applicant ultimately chosen." *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 25 (D.C. Cir. 2013) (cleaned up).  Or she can, among other things, point to "changes and inconsistencies in the stated reasons for the adverse action; the employer's failure to follow established procedures or criteria; the employer's general treatment of minority employees; or discriminatory statements by the decisionmaker." *Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013) (quoting *Brady*, 520 F.3d at 495 n. 3).  Williams argues that she can show all that and more, but in the end, the evidence here would not allow a reasonable jury to find that she was the victim of race or sex-based discrimination.

### A.      Relative Qualifications

"To prevail on a relative qualifications claim," Williams "must show that she [was] 'significantly better qualified for the job than'" Kelley.  *Grosdidier*, 709 F.3d at 25 (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008)).  The qualifications gap between candidates must be great enough for a reasonable juror to find it "inherently indicative of discrimination," *Holcomb*, 433 F.3d at 897.  In contrast, "a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone."  *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998).  Indeed, an employer may even select "a candidate who on paper is less qualified for other reasons, such as subjective reactions that emerge in the interview," though "purely subjective explanations" are treated with caution if a plaintiff is obviously more qualified.  *Jackson v. Gonzales*, 496 F.3d 703, 709 (D.C. Cir. 2007) (internal quotation omitted).

Courts should "defer to the Government's decision of what nondiscriminatory qualities it will seek in filling [a] position," *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003), "which qualities required by the job . . . it weighs more heavily," *Barnette v. Chertoff*, 453 F.3d 513, 517 (D.C. Cir. 2006), and whether to consider other credentials or skills "not expressly listed in the job description when the factor was encompassed by the job description," *Jackson*, 496 F.3d at 709.  They should "refuse to assess[ ] the significance of small differences in substantive experience . . . or length of service." *Barnette*, 453 F.3d at 517 (cleaned up); see also *Brown v. Small*, 437 F. Supp. 2d 125, 135 (D.D.C. 2006) ("A court will not second-guess an employer's personnel decision unless the disparities in qualifications are so apparent as to virtually jump off the page and slap it in the face.") (quoting *Hammond v. Chao*, 383 F. Supp. 2d 47, 57 (D.D.C. 2005)).  In other words, Title VII is not an avenue for courts to serve as "super-personnel departments that reexamine an entity's business decisions," *Stewart*, 352 F.3d at 429 (cleaned up), or to impede employers' "unfettered discretion to choose among qualified applicants," *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

Defendant represents that Feather selected Kelley because he had the most experience as a Chaplaincy Services Coordinator and Regional Chaplaincy Administrator, the most seniority within the Bureau, field experience as a supervisor at a penitentiary with a challenging inmate population, had served as a national trainer for the Bureau's Crisis Support Team, and because Kugler and Butterfield recommended him.  ECF No. 24-1 at 13–14.  In response, Williams makes the point that, according to Feather, Kelley and Williams had similar substantive experience and notes that Feather did not mention Kelley's national experience as a reason for selection in her EEO interrogatory.  ECF No. 28 at 44.  Even so, in "cases where the comparative qualifications are close, a reasonable jury would not usually find discrimination" and a court

must "respect the employer's unfettered discretion to choose among qualified candidates." *Adeyemi*, 525 F.3d at 1227 (citations omitted). Given Kelley's longer tenure at the Bureau and his range of experience, Williams cannot show she was substantially more qualified than Kelley such that an inference of discrimination is warranted.

### B.   Feather's Selection Process

Williams's claim may still survive if she can identify other aspects of Feather's decision or the selection process from which a reasonable juror could conclude that her race or sex was a motivating factor in her non-selection. First, Williams points out that Feather's deposition testimony contradicts her statement in an interrogatory response to the EEOC during the EEOC's investigation into Kelley's selection. ECF No. 28 at 10. Eight months after the selection, Feather represented to the EEOC that she knew Williams's race when she selected Kelley. *Id.* In her deposition during this litigation—three and a half years after the selection—Feather denied knowing Williams's race. *Id.* But this contradiction does not help Williams as much as she hopes. The Circuit has declined to hold that a defendant's legitimate, nondiscriminatory reason for an employment action may be rebutted by a "deponent's inability to recall specifics three years" later. *Paquin v. Fed. Nat'l Motg. Ass'n*, 119 F.3d 23, 30 (D.C. Cir. 1997). And of course, a decisionmaker's knowledge of an applicant's race does not suggest—let alone prove— that he discriminated against the applicant. *See* ECF No. 28 at 11. Williams's other claim that Feather's testimony shows she "was convinced by someone to change her sworn answer three and a half years later" to "conceal discriminatory animus" is just speculation. *Id.* at 10–11.

Second, Williams says Feather's decision to not affirmatively seek out and consider the recommendation of an African-American during the selection process shows her racial animus. ECF No. 28 at 18. Williams argues Feather should have sought the advice of Dr. Michael Smith. *Id.* Smith was previously the Chaplaincy Administrator at the Bureau; he retired in October

2015.  ECF No. 28-5 ¶ 2.  But Feather did not seek advice from any past employee of any race on filling the Assistant Chaplaincy Administrator role; she relied on Kugler and Butterfield's recommendations and the materials Kugler provided her.  ECF No. 32-2 at 20.  Her decision to rely on two current-employees rather than a person no longer employed by the Bureau—and who she had only met once on his last day there—does not evidence any discriminatory animus.  ECF No. 33-2 at 3.

Third, Williams argues Feather should have considered Williams's performance rating during the selection process and that her failure to do so shows her animus.  ECF No. 28 at 19.  For many positions, the Bureau's Human Resources Manual requires a selecting panel to consider an applicant's performance rating.  *Id.*  Between 2010 and 2015, Williams received a rating of 480 each year.  *Id.*  For the 2015-2016 year, she received a score of 460.  *Id.*  In contrast, Kelley received scores ranging from 380 to 480 over the same time.  *Id.*  But like the others, this argument runs into problems.  The Assistant Chaplain Administrator position is exempt from the Manual because it falls under the excepted service.  5 C.F.R. § 213.3102(a).  Thus, the vacancy announcement for the position did not require applicants to submit their most recent performance rating.  *See* ECF No. 25-10; *cf.* ECF No. 28-14 at 10 (requiring applicants to non-exempt positions to submit "a copy of their most recent performance rating").  Thus, the Manual did not require the selecting official—here, Feather—to consider performance ratings when selecting a candidate.  ECF No. 28-14 at 11–14.  So this hardly gives rise to an inference of discrimination.

### C.    Cat's-Paw Theory

Finally, Williams's claim can still survive summary judgment if a reasonable juror could conclude that Butterfield and Kugler inserted discriminatory animus into the selection process and that animus tainted Feather's decision.  Williams alleges the pair "took advantage of Ms.

Feather's lack of familiarity with the chaplaincy services branch and the candidates for the ACA position to advance their discriminatory animus."  ECF No. 28 at 13.  "Under a cat's-paw theory, a formal decision maker may be an unwitting conduit of another actor's illicit motives."  *Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015).  "[E]vidence of a subordinate's bias is relevant" in a selection decision "where the ultimate decision maker is not insulated from the subordinate's influence."  *Griffin v. Wash. Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998).  To prevail on this theory, a plaintiff must show (1) "a supervisor performs an act motivated by [unlawful] animus," (2) the supervisor intends to "cause an adverse employment action," and (3) "that act is a proximate cause of the ultimate employment action."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); *Morris v. McCarthy*, 825 F.3d 658, 668–69 (D.C. Cir. 2016) (applying test to Title VII claim).  Proximate cause "requires only some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect."  *Staub*, 562 U.S. at 419.

Beginning with Kugler, Williams argues she acted with discriminatory motive in preparing the candidate summary chart and the accompanying sticky notes.  As Williams concedes, however, Kugler added the notes to the chart because *Butterfield* told her to include anything else Feather "should be aware of" when evaluating the candidates.  ECF No. 25-2 at 52–53; No. 28 at 29–30.  And though the sticky notes contained negative, and perhaps subjective, points about Williams's candidacy, Kugler also included similar negative points about another candidate who was a Caucasian man.  ECF No. 25-17 at 3; ECF No. 28-9.  And Kugler explained a concrete reason why she had included her comment about "stress management and emotional intelligence": she had observed Williams yelling at another Bureau employee.  ECF No. 28 at 37.  Williams submits this "one time incident" did not justify Kugler's

11

sticky note evaluation. *Id.*  But a "plaintiff cannot establish pretext simply based on her own subjective assessment of her own performance." *Tolson v. James*, 315 F. Supp. 2d 110, 116 (D.D.C. 2004) (cleaned up).

Williams also points out that she only learned of the sticky notes at Feather's deposition, since they had not been provided to the Bureau's human resources department.  ECF No. 28 at 35.  But again, the sticky notes hardly bespeak race or sex discrimination when they contained negative comments about a white man's application, as well as Williams's.  And there is no evidence that Kugler or Butterfield acted to affirmatively conceal the sticky notes from the human resources department.  As for the chart, Williams says that Kugler treated her differently than Kelley because she did not include the trainings Williams received or gave. *Id.* at 29.  But Kugler explains that she only included leadership positions and national trainings candidates offered to others, and only three candidates on the chart—not Williams—had that kind of experience.  ECF No. 25-17 at 1–2; ECF No. 32-4 at 5.

Williams's remaining arguments that Kugler acted with animus could not persuade a reasonable jury of that, to say the least.  Her main complaints relate to how Kugler supervised her before the selection process.  ECF No. 28 at 22.  She asserts that Kugler dismissed Williams's and another African-American's contributions in meetings, was short with her on telephone conversations, and would call herself "boss" when interacting with Williams. *Id.*  But her testimony in support of these claims is in many ways conclusory and does not suggest that race or sex played a factor in her supervision. *Id.* at 22; 28; ECF No. 28-2 at 6–8.  Williams also mentions a conversation following Kugler's promotion to Chaplaincy Administrator in which Kugler told her that she would support her if she wanted to move to a different branch and that Kugler was aware she benefitted from "white privilege."  ECF No. 28-2 at 19.  These are

anodyne comments.  *See Hairston v. Vance-Cooks*, 773 F.3d 266, 274 (D.C. Cir. 2014) (no inference of discrimination "if the words uttered are plainly lacking in racial animus").  And Williams claims that Kugler rated African-Americans less favorably than non-African-Americans.  ECF No. 28 at 24.  But her own limited evidence on that point contradicts her claim.  In 2015-2016, Kugler gave Kelley and Williams identical performance ratings of 460, which corresponds to "Excellent."  *Id.* at 19.  Finally, Williams complains that Kugler did not discipline Kelley following complaints against him by Williams and another African-American employee, Terry Saulsberry.  *Id.* at 26.  But the record shows that, in at least one instance, Kugler issued Kelley a cautionary warning.  ECF No. 24-1 at 19.  The other two instances Williams cites were workplace disputes that Kugler felt did not warrant intervention.  ECF No. 25-2 at 65, 75; ECF No. 28-29 at 9.  This may have frustrated Williams, but Title VII does not impose an obligation to uphold a "general civility code for the American workplace."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White¸* 548 U.S. 53, 68 (2006)).  More importantly, Williams provides no evidence that Kugler responded to her complaints differently than complaints from non-African-American employees.

Williams takes aim at Butterfield too.  She speculates Butterfield "induce[d] Ms. Kugler to write the derogatory sticky note" about Williams.  ECF No. 28 at 37.  There is no evidence of that.  Butterfield's uncontested instruction to Kugler referred to all the candidates generally and did not single out Williams.  *Id.* at 36–37.  Williams also objects to Butterfield's rating of her oral communication skills.  *Id.* at 30–31.  She says that Butterfield should have checked "Not Observed" on the reference form rather than providing a reference based on information from Kugler.  *Id.* at 31.  But Butterfield was providing a reference as a third-level supervisor — someone who did not directly supervise Williams.  It makes sense that she would have relied on

Kugler to provide information about Williams.  Moreover, Feather testified this tracked her expectations as well.  ECF No. 32-2 at 17.  And Butterfield provided a reference based on information she received from others for two other applicants—Kelley and Castle, another Caucasian man.  ECF No. 24-2 ¶¶ 22, 24–26; ECF No. 28-9.

Williams's most concrete complaint with Butterfield is that she rated Williams's oral communication skills "average."  ECF No. 28 at 30.  She claims Butterfield has a pattern of ranking African-Americans' oral skills lower than those of Caucasians.  For example, in a previous selection process to fill the Chaplaincy Administrator job that Kugler now holds, Butterfield rated Saulsberry's oral skills "average."  *Id.* at 33.  In justifying that rating, Butterfield explained Saulsberry was not "as assertive in sharing information" but failed to explain exactly how Saulsberry's oral skills were deficient.  ECF No. 28-3 at 27.  But here, Butterfield cited the incident in which Kugler witnessed Williams yelling at another Bureau employee as the reason for Williams's rating.  *See Elliott v. Acosta*, 291 F. Supp. 3d 50, 63 n.4 (D.D.C. 2018) (subjective considerations did not support an inference of discrimination in part because hiring official "provided concrete examples to explain her subjective assessments").  Williams responds that Kugler, who witnessed the incident, still gave her an "above average" rating.  ECF No. 28 at 32.  But just because two individuals give different evaluations does not mean race or sex discrimination played a role in the discrepancy, no matter how Williams felt the incident reflected (or did not reflect) on her communication skills.  *See Tolson*, 315 F. Supp. 2d at 116.  Butterfield also gave Williams the highest ratings in the remaining five categories, stated that she would employ Williams in the position, and gave her the highest rating in leadership.  ECF No. 28-31.  Given Butterfield's explanation and her top ratings of Williams in other subjective areas such as "Responsiveness," "Analytical Ability," "Written Communication

Skills," and "Leadership Skills," her rating of an applicant in a separate selection process does not suggest discrimination in how she handled Williams's candidacy.

Williams also looks to the previous selection process that filled the Chaplaincy Administrator position for other reasons to infer that Butterfield discriminated against her in the process at issue here. But none of what she cites supports an inference of discrimination. In 2015, Butterfield ended up recommending Kugler for the position of Chaplaincy Administrator over Williams and Saulsberry. In fact, Butterfield excluded Williams and all other GS-13 applicants from the candidate pool because she believed the minimum qualification for the GS-15 Chaplaincy Administrator position included being a GS-14 employee. ECF No. 32 at 10. A human resources employee told her GS-13 employees could not be promoted to a GS-15 position, even though that turned out not to be true. *Id.*; ECF No. 28 at 14; ECF No. 28-3 at 23. In this Circuit, "an employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false." *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005). And Williams does not point to any evidence that Butterfield did not believe, in good faith, that Williams was ineligible. Williams also claims Butterfield acted with animus by not passing along Dr. Michael Smith's recommendation for the position to the selecting official. ECF No. 28 at 21. But Butterfield told the selecting official that Smith ranked the applicants in the order of "Mary Tyes-Williams, Heidi Kugler, and then Terry Saulsberry."[2] ECF No. 32-8 at 6–7. That Butterfield passed on a recommendation that put Williams first hardly seems to suggest discrimination against her.

---

[2] Williams purports to contest what Butterfield told the selecting official, but she fails to cite evidence that creates a genuine, material dispute about it. *See* ECF No. 28 at 21 (citing ECF No. 28-6 at 6–7).

Thus, for all the above reasons, Defendant is entitled to summary judgment because a reasonable jury could not conclude that Williams was the victim of a discriminatory non-selection, under either a but-for or mixed-motive theory.

## V.     Conclusion

For the above reasons, the Court will grant Defendant's motion for summary judgment, ECF No. 24.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 20, 2021